

**ORIGINAL** "O"

ENTERED
CLERK, U.S. DISTRICT COURT

JUL - 3 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL - 2 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

Priority
Send
Enter

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CKE RESTAURANT., a Delaware corporation, CARL KARCHER ENTERPRISES, INC., a California corporation, and HARDEE'S FOOD SYSTEMS, INC., a North Carolina corporation,<br><br>          Plaintiffs,<br><br>      v.<br><br>JACK IN THE BOX, INC., a Delaware corporation,<br><br>          Defendant. | CASE NO. SACV 07-0603 AG (JTLx)<br><br>~~(TENTATIVE)~~ ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

    This case concerns the often aggressive and sometimes amusing advertising campaigns for fast food, which might be called the Burger Battles. The full and vigorous communication of product advertisement is an inherent and often helpful part of our free market economy. But there are rules of war in the Burger Battles, and Plaintiffs CKE Restaurants, Inc., Carl Karcher Enterprises, Inc., and Hardee's Food Systems, Inc. ("Plaintiffs") argue that these lines have been crossed.

    To defend their territory, Plaintiffs bring their Motion for Preliminary Injunction

32

1  ("Motion"). Where's the beef? Plaintiffs rely exclusively on the Lanham Act and California

2  Business and Professions Code sections 17500 et seq. and 17200 et seq. in this case, which

3  focuses largely on the source of the beef used in the parties' patties. The meat of the Plaintiffs'

4  motion is that these federal and California statutes are violated by statements and jokes made in

5  hamburger advertisements that appear on prime time television. Plaintiffs contend that these

6  statements are likely to deceive consumers and hurt their customer base. After considering the

7  moving, opposing, reply, and sur-reply papers, and oral argument by the parties, the Court

8  DENIES Plaintiffs' Motion.

9

10  **BACKGROUND**

11

12          This Motion centers on Plaintiffs' claim that Defendant Jack in the Box, Inc.

13  ("Defendant") has made false and misleading claims in two television commercials that have

14  caused Plaintiffs irreparable injury. Plaintiffs operate restaurants that offer quick-service and

15  fast casual dining at more than 3,100 locations in 43 states and 13 countries. (Memorandum in

16  Support of Plaintiffs' Preliminary Injunction ("Plaintiffs' Memorandum") 2:4-6.) For several

17  years, Plaintiffs have offered a hamburger sandwich under their Carl's Jr. and Hardee's brands

18  that is made with 100% USDA approved Angus beef ("100% Angus Burger"). (Declaration of

19  Brad Haley ("Haley Decl.") ¶ 5.) The term Angus signifies that the meat is from a specific breed

20  of cattle. Carl's Jr. sells a 100% Angus Burger called the Six Dollar Burger, and Hardee's sells

21  a 100% Angus Burger called a Thickburger. (Haley Decl. ¶ 6.) Both burgers have been the

22  subject of substantial advertising campaigns and have received publicity. (Haley Decl. ¶ 7.)

23          Defendant operates a network of over 2,000 quick-serve restaurants in the United States.

24  Defendant recently began marketing a new product made from 100% ground sirloin beef ("100%

25  Sirloin Burger"). (Declaration of Terri Graham ("Graham Decl.") ¶ 3.) Sirloin refers to a

26  particular cut of beef rather than a type of cattle. (Graham Decl. ¶ 3.)

27          To market these new 100% Sirloin Burgers, Defendant has created the two challenged

28  television commercials. In the first commercial, Jack, a clown-headed fictional CEO of

1  Defendant, is making a presentation to his employees.

2  Jack states:

3         Okay. Listen up. This is big. We have launched the first 100% sirloin burger in

4         fast-food history. Take a look. That's 100% ground sirloin, seasoned while it

5         cooks. People can choose what kind of cheese and onions they want. But it's the

6         sirloin that has to be tasted to be believed. Now for those of you not from Texas,

7         that's the sirloin area. (Pointing to the area of a cow where the sirloin cut is from.)

8  Employee states:

9         Jack, our competitors serve Angus burgers. Could you point to the Angus area?

10  Jack:

11         (looks behind him at the rear of the cow and faces Employee:)

12         I'd rather not.

13  (Plaintiffs' Memorandum, Ex. 6.)

14      In the second commercial, the camera focuses on employees raucously laughing.

15  First Employee states:

16      And that completes my report on what our competitor is doing with its Angus burger.

17      (After the word Angus, the other employees burst into a new round of laughter.)

18  Jack states:

19         Alright settle down. Settle down. I've got film of our new Sirloin burger here. As

20         you can see, it's our 100% sirloin patty. We're the only ones in fast food doing

21         that. People can choose what kind of cheese and onions they want. But it's the

22         sirloin that makes the burger amazing. Question?

23  Second Employee states:

24         Are you saying that people will find our sirloin more attractive than their

25         Angus...es? (Laughter erupts.)

26  (Plaintiffs' Memorandum, Ex. 5.)

27      The Court now turns to Plaintiffs' claims.

28

1    **PRELIMINARY INJUNCTION ANALYSIS**

2

3    A preliminary injunction is a drastic and extraordinary remedy that should not be granted

4    unless the movant, by a clear showing, carries the burden of persuasion.  See Mazurek v.

5    Armstrong, 520 U.S. 968, 972 (1997).  A plaintiff may meet this burden by "demonstrating

6    either (1) a combination of probable success on the merits and the possibility of irreparable

7    injury or (2) that serious questions are raised and the balance of hardships tips sharply in his

8    favor."  Dollar Rent A Car, Inc. v. Travelers Indem. Co., 774 F.2d 1371, 1374-75 (9th Cir.

9    1985); Prudential Real Estate Affiliates, Inc. v. PRR Realty, Inc., 204 F.3d 867, 874 (9th Cir.

10    2000).

11    "These are not separate tests, but outer reaches of a single continuum."  Dollar Rent A

12    Car, 774 F.2d at 1374-75 (quoting Benda v. Grand Lodge of the Int'l Ass'n of Machinists &

13    Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978) (internal quotation marks omitted)).

14    However, in any situation, the court must find that there is at least a fair chance of success on the

15    merits, see Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995),

16    and that there is some threat of an immediate irreparable injury.  See Big Country Foods, Inc. v.

17    Board of Ed. Of the Anchorage Sch. Dist., 868 F.2d 1085, 1088 (9th Cir. 1989).

18

19    1.    **LIKELIHOOD OF SUCCESS ON THE MERITS**

20

21    **1.1    Lanham Act Claim**

22

23    To prove a claim for false advertising under the Lanham Act, 15 U.S.C. §

24    1125(a)(1)(B), Plaintiffs must establish:

25

26    1) in advertisements, defendant made false statements of fact about its own or

27    another's product;

28    2) those advertisements actually deceived or have the tendency to deceive a

4

1  substantial segment of their audience;

2  3) such deception is material, in that it is likely to influence the purchasing

3  decision;

4  4) defendant caused its falsely advertised goods to enter interstate commerce; and

5  5) plaintiff has been or is likely to be injured as the result of the foregoing either

6  by direct diversion of sales from itself to defendant, or by lessening of the

7  goodwill which its products enjoy with the buying public.

8

9  <u>Rice v. Fox Broad. Co.</u>, 330 F.3d 1170, 1180 (9th Cir. 2003).  Plaintiffs contend that it can

10  establish a likelihood of success on each of these factors.  Defendant argues that Plaintiffs

11  cannot establish that a false statement was made, or that the advertisements have a tendency to

12  deceive a substantial segment of their audience, or that Plaintiffs have been or are likely to be

13  injured. (Plaintiffs' Memorandum 10:8-12.)  The Court examines each argument.

14

15  1.1.1  False Advertising Statements and Tendency to Deceive

16

17  To establish the first and second prongs, Plaintiffs isolate two statements within the

18  challenged commercials that they claim are false or misleading and have a tendency to deceive

19  consumers.  Plaintiffs state that "Defendant explicitly and implicitly claims that the beef used in

20  Defendant's Sirloin Burger is of superior quality to that of the [Plaintiffs'] 100% Angus

21  Hamburger." (Plaintiffs' Memorandum 3:15-17.)  Plaintiffs argue that Defendant's claims

22  create the misleading impression that sirloin beef is superior to Angus beef. (Plaintiffs'

23  Memorandum 3:17-20.)  Plaintiffs also state "Defendant's Sirloin Burger Commercials create

24  the false impression that the meat used in [Plaintiffs'] 100% Angus Beef Hamburgers comes

25  from the rear-end and/or anus of beef cattle by creating phonetic and aural confusion between

26  the words 'Angus' and 'anus.'" (Plaintiffs' Memorandum 3:21-24.)  Defendant claims that these

27  statements are not literally false, and Plaintiffs have not adequately supported any claim that

28  these statements are misleading. (Defendant Jack in the Box, Inc.'s Opposition to Plaintiffs'

5

1  Motion for Preliminary Injunction ("Opposition") 11:3-4, 12:19-23.)  The Court finds

2  Defendant's arguments persuasive.

3       To succeed under the Lanham Act, the plaintiff need not establish actual falsity.  "[T]he

4  Lanham Act encompasses more than blatant falsehoods.  It embraces innuendo, indirect

5  intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension

6  of the hard facts underlying an advertisement."  William H. Morris Co. v. Group W, Inc., 66

7  F.3d 255, 257-258 (9th Cir. 1995) (citing Vidal Sassoon, Inc. v. Bristol-Myers Co., 661 F.2d

8  272, 277 (2d Cir. 1981)).  Thus, "[e]ven if an advertisement is not literally false, relief is

9  available under Lanham Act § 43(a) if it can be shown that the advertisement has misled,

10  confused, or deceived the consuming public."  Southland Sod Farms v. Stover Seed Co., 108

11  F.3d 1134, 1140 (9th Cir. 1997).

12       Plaintiffs do not argue that statements made in the challenged commercials were literally

13  false, but rather they argue that the statements were misleading.  "Where a statement is not

14  literally false and is only misleading in context, . . . proof that the advertising actually conveyed

15  the implied message and thereby deceived a significant portion of the recipients becomes

16  critical."  Morris, 66 F.3d at 258.  In fact, courts in this circuit have held that where "a plaintiff's

17  theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate,

18  by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse

19  consumers."  Mut. Pharm. Co. v. Ivax Pharms., 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006).

20  While "a court may find on its own that a statement is literally false, whether a representation is

21  impliedly misleading is not something that is readily susceptible to being evaluated absent

22  'evidence [showing] actual consumer deception.'"  Id. (citation omitted).

23       Here, Plaintiffs provide the Court with a pilot survey as preliminary evidence of

24  consumer deception.  The survey questionnaire asked consumers from four different cities to

25  answer various questions after viewing both of Defendant's challenged commercials.  The

26  survey involved answering questions "based only on what [the consumer] saw in the

27  commercials, and not based on any independent knowledge [the consumer] might have."

28  (Declaration of Allan T. Popelka ("Popelka Decl."), Ex. A at 24.)  The survey asked, "Based on

1  the commercials, does Angus beef refer to where on the cow the meat comes from, a type of

2  cattle, neither statement is true, both statements are true, or you don't know?" (Popelka Decl.,

3  Ex. A at 24.)  The survey generally asked consumers to select one of four potential answers to

4  the questions posed about what the commercials said. (Popelka Decl., Ex. A at 24.)  The survey

5  then asked if the consumer was more likely, less likely, neither more or less likely, or unsure of

6  buying a hamburger with Angus beef. (Popelka Decl., Ex. A at 24.)

7       Plaintiffs state that "a statistically significant number of participants were misled by the

8  commercials into believing that Angus is a cut of meat rather than a breed of cattle, that Angus

9  beef is an inferior type of meat, and that Angus beef emanates from the rear-end and/or anus of

10 beef cattle." (Reply 3:2-6.) Defendant argues that the survey is unreliable, and these

11 conclusions are therefore baseless.  (Defendant Jack In the Box, Inc.'s Sur-Reply in Opposition

12 to Plaintiffs' Motion for Preliminary Injunction ("Sur-Reply") 6:6-10.)  The Court agrees with

13 Defendant that the survey should be given very little weight.

14      The Ninth Circuit has stated that "surveys in trademark cases are to be admitted as long as

15 they are conducted according to accepted principles." E. & J. Gallo Winery v. Gallo Cattle Co.,

16 967 F.2d 1280, 1292 (9th Cir. 1992).  "Technical unreliability goes to the weight accorded a

17 survey, not its admissibility." Id.  The weight and "evidentiary value of a survey's results rest[]

18 upon the underlying objectivity of the survey itself.  This objectivity, in turn, depends upon many

19 factors, such as whether [the survey] is properly 'filtered' to screen out those who got no

20 message from the advertisement, whether the questions are directed to the real issues, and

21 whether the questions are leading or suggestive." Johnson & Johnson * Merck Consumer

22 Pharms. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 300 (2d Cir. 1992) (internal citations

23 and quotations omitted).

24      Plaintiffs' survey uses leading and suggestive questions, and consumers were not

25 permitted to articulate their own impressions of the commercials.  Typically, consumer

26 perception surveys begin with open-ended questions that permit consumers to identify the

27 primary message of a commercial and any source of deception. (Declaration of Michael B.

28 Mazis ¶¶ 11-12).  In Plaintiffs' survey, the questions were unfairly framed as to beg the results

7

1   that Plaintiffs ultimately received.  Consumers were given responses that suggested the answers

2   that Plaintiffs wanted.  By providing the consumers with the suggested response, Plaintiffs

3   increased the likelihood of biased results.  Further, Plaintiffs' survey is worded in such a way as

4   to obscure whether any inference suggested by the commercial was negated because the

5   consumer understood the joke.  These deficiencies in the survey's design weaken the relevance

6   and credibility of the survey evidence to the point where it sheds little if any light on the issue of

7   likelihood of deceiving consumers.

8        Plaintiffs also argue that a court may presume that consumers were in fact deceived

9   because the alleged false or misleading statements were intentionally created "to persuade

10   customers into misbelieving that any cut of Angus beef is inferior to sirloin beef." (Plaintiffs'

11   Memorandum 6:22-24.)  But Defendant's challenged commercials do not support such a finding

12   of intent.  At most, the Court finds that Defendant's commercials intend to bolster its own brand

13   and its own product by emphasizing the positive aspects of the Sirloin Burger.  The Court does

14   not find that Defendant's commercials alone support a finding that Defendant intended to

15   deceive consumers with false or misleading misstatements, and thus the presumption is

16   inapplicable.

17        Without substantial extrinsic evidence that a significant potion of the commercial

18   audience has been deceived or evidence of Defendant's intent to mislead consumers, Plaintiffs

19   raise at most only serious questions regarding whether they can establish that the statements are

20   false and have a tendency to deceive consumers.  Since Plaintiffs only barely meet the "serious

21   questions" standard in the preliminary injunction continuum, they have a higher standard to meet

22   in the balancing of hardships at Section 2.

23

24            1.1.2   Materiality and Likelihood to Harm Plaintiffs

25

26        Turning to the third and fifth prongs, Plaintiffs claim that the alleged deception is material

27   and likely to harm Plaintiffs.  Again, Plaintiffs support this with its pilot survey evidence.  While

28   the Court accepts that Plaintiffs may show that these statements are relevant to a consumer,

1   Plaintiffs' survey does not adequately support Plaintiffs' contention that they are likely to be

2   harmed. In fact, Plaintiffs' survey establishes that consumers are not as unsophisticated and

3   gullible as Plaintiffs suggest. While Plaintiffs' survey indicates that 17% of consumers were less

4   likely to buy hamburgers made with Angus beef, the survey also revealed that 14% of consumers

5   were more likely to buy hamburgers made with Angus beef. (Popelka Decl. ¶ 17.) This result

6   undermines any interpretation of the survey as establishing that Plaintiffs are significantly

7   harmed.

8        Plaintiffs also argue that harm may be presumed because their claims involve comparative

9   advertising. Plaintiffs rely solely on <u>Mutual Pharmaceutical Co. v. Ivax Pharmaceuticals</u>, 459 F.

10   Supp. 2d 925 (C.D. Cal. 2006). That case holds that "[w]hen an advertisement draws an explicit

11   comparison between the competitor's product and plaintiffs', then such a causative link of

12   irreparable injury is presumed because 'a misleading comparison to a specific competing product

13   necessarily diminishes that product's value in the minds of the consumer.'" <u>Id</u>. at 944 (citing

14   <u>McNeilab, Inc. v. Am. Home Products Corp.</u>, 848 F.2d 34, 38 (2nd Cir. 1988)). But it further

15   holds that this presumption only applies when there is a direct reference to the competitor's

16   product. <u>Id</u>. at 944-945.

17        Here, there is no such direct comparison to Plaintiffs' product. The challenged

18   commercials merely refer to "our competitor's product." While a non-comparative commercial

19   may produce a valid claim against the entity making the statement, such a commercial does not

20   carry with it the presumption of harm discussed in <u>Mutual Pharmaceutical</u>. The injury in cases

21   involving non-comparative statements "accrue[] equally to all competitors; none is more likely

22   to suffer from the offending broadcasts than any other." <u>McNeilab</u>, 848 F.2d at 38. "Thus,

23   [courts] require[] some indication of actual injury and causation to satisfy Lanham Act standing

24   requirements and to ensure a plaintiff's injury was not speculative." <u>Id</u>.

25        Plaintiffs lack any evidence that establishes actual injury and causation. Plaintiffs' survey

26   does not address whether Plaintiffs will experience any particular harm. Rather, the survey

27   questions ask consumers to give their general feelings about purchasing Angus burgers and do

28   not explore consumers' impressions on whether Plaintiffs, rather than any other competitors,

1   would be damaged. Based on this evidence, the Court cannot conclude that Plaintiffs are

2   harmed specifically by any potentially false or misleading representations in the commercial

3   rather than just the mere advertisement of a competing product that attempts to use effective

4   marketing techniques. Thus, this evidence is not sufficient to make Plaintiffs' necessary

5   showing of actual injury and causation.

6        Plaintiffs attempt to further bolster their arguments by providing additional evidence that

7   they may be injured in the future. Plaintiffs concede that they have not been able to project the

8   specific damage that will be caused but they estimate that "the figure is likely to be devastating."

9   (Declaration of Andrew F. Puzder ("Puzder Decl.") ¶ 7.) Plaintiffs state that "[e]ven a 1% sales

10   decline of [Plaintiffs'] 100% Angus beef hamburger in [Plaintiffs'] most recent sales period

11   would equate to lost sales of millions of dollars." (Puzder Decl. ¶ 7.) Plaintiffs further assert

12   that they are "still evaluating what type of corrective advertising would be needed" as a result of

13   the challenged commercials, but they believe the cost of such a correction "will be in the

14   millions of dollars." (Second Declaration of Brad R. Haley ¶ 6.)

15        The Court finds that this evidence is likely to be insufficient to establish a likelihood of

16   harm. While Plaintiffs state that they may experience harm, the damages claimed are too

17   speculative. At the present time, Plaintiffs have not presented any evidence or argument

18   suggesting that they have already been damaged, and rather argue that any harm could be

19   catastrophic. To succeed on a Lanham Act claim, the alleged injury does not necessarily need to

20   be quantifiable, but it does need to appear more certain than Plaintiffs have established. The

21   Court therefore finds that Plaintiffs have at most only raised serious questions about establishing

22   their likelihood of harm, and thus in Section 2 must show that the balance of hardships tips

23   sharply in Plaintiffs' favor.

24

25                 1.1.3   Interstate Commerce

26

27        Neither party disputes that Plaintiffs meet the fourth prong by establishing that the

28   commercials were aired in the national market and that Defendant sells and advertises goods in

1    interstate commerce.  Thus, Plaintiffs have demonstrated a likelihood of success on this element.

2

3              **1.2    Plaintiffs' State Claims**

4

5           Plaintiffs also seek a preliminary injunction on its state claims under California Business

6    and Professionals Code sections 17200 et seq. and 17500 et seq.  Section 17200 et seq. prohibits

7    "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

8    misleading advertising and any act prohibited by § 17500."  Ariz. Cartridge Remanufacturers

9    Ass'n v. Lexmark Int'l, Inc., 421 F.3d 981, 985 (9th Cir. 2005) (citing Day v. AT&T, 63 Cal.

10   App. 4th 325 (1998)).  Section 17500 et seq. makes it unlawful for a business to disseminate any

11   statement "which is untrue or misleading, and which is known, or which by the exercise of

12   reasonable care should be known, to be untrue or misleading . . . ."

13           Plaintiffs state that "the factors under the California state law claims are quite similar to

14   those for § 43(a)" of the Lanham Act.  (P&A's 5:22-23.)  "This Circuit has consistently held that

15   state common law claims of unfair competition and actions pursuant to California Business and

16   Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."

17   Cleary v. News Corp., 30 F.3d 1255, 1262-1263 (9th Cir. 1994).  Because Plaintiffs do not raise

18   any additional argument and neither party argues that the state claims require consideration of

19   different legal standards, the Court finds that Plaintiffs have not established a likelihood of

20   prevailing on their state claims for the reasons stated in Section 1.1.

21

22              **1.3    Defendant's Defense of Unclean Hands**

23

24           In its defense, Defendant argues that Plaintiffs will not succeed on their claims because

25   the doctrine of unclean hands bars them from the relief sought.  Defendant states that Plaintiffs

26   have engaged in the same conduct that they challenge in this case.  Defendant cites a commercial

27   for Plaintiffs' Chicken Breast Strips that "attacked competitors selling chicken "nuggets" with

28   the exact same tongue-in-cheek style that [Defendant] now is using to challenge competitors

                                          · 11

1   selling Angus burgers." (Opposition 17:20-23.) Defendant also cites Plaintiffs' commercial for

2   its milkshakes that "offers additional illustration of [Plaintiffs'] unclean hands." (Opposition

3   18:12-14.) Plaintiffs state that the messages of these commercials are distinct from the

4   challenged commercials and their previous advertisements do not implicate the doctrine of

5   unclean hands. The Court agrees with Plaintiffs.

6        "Unclean hands is a defense to a Lanham Act infringement suit." Japan Telecom, Inc. v.

7   Japan Telecom Am., Inc., 287 F.3d 866, 870 (9th Cir. 2002). "To prevail . . . equity requires that

8   those seeking its protection shall have acted fairly and without fraud or deceit as to the

9   controversy in issue." Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1313 (9th Cir. 1997) (citing

10  Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir. 1987) (internal

11  citations and quotations omitted). "To make out an unclean hands defense, a trademark

12  defendant 'must demonstrate that the plaintiff's conduct is inequitable and that the conduct

13  relates to the subject matter of its claims.'" Japan Telecom, Inc., 287 F.3d at 870 (internal

14  citations omitted).

15       Defendant claims that Plaintiffs' commercials engage in the same kind of commentary

16  that Plaintiffs accuse Defendant of creating. But the Court finds that these commercials do not

17  make any false or misleading claims. Plaintiffs' milkshake commercial involves a play on the

18  term milkshake with the humorous image of shaking a cow. Plaintiffs' chicken nuggets

19  commercial also plays on the term nuggets, potentially suggesting that the term signifies

20  testicles. But unlike Defendant's commercial, the message of Plaintiffs' nuggets commercial is

21  that nuggets do not come from a body part of a chicken. Thus, Plaintiffs' commercial denies any

22  implication that their competitors' nuggets come from testicles. This is inherently different than

23  Defendant's commercials, which potentially imply that an Angus burger is made from an

24  unsavory cut of beef.

25       The implications Defendant attributes to Plaintiffs' commercials are more strained than

26  the implications attributed to Defendant's commercials, however strained. There are limits to

27  the gullibility that can be attributed to American consumers. Defendant's commercials,

28  actionable or not, decidedly go further than any suggestion raised by Plaintiffs' commercials.

1    The Court therefore finds that Defendant's unclean hands defense is not likely to succeed.

2

3        **2.    BALANCE OF HARDSHIPS**

4

5        If the Plaintiffs only succeed in establishing that "serious questions" exist about the

6    merits, it must meet the more difficult test of showing that "the balance of hardships tips sharply

7    in favor of the moving party." <u>Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.</u>, 240 F.3d 832,

8    840 (9th Cir. 2001). "In evaluating the balance of hardships a court must consider the impact

9    granting or denying a motion for a preliminary injunction will have on the respective

10   enterprises." <u>Int'l Jensen v. Metrosound U.S.A.</u>, 4 F.3d 819, 827 (9th Cir. 1993) (considering

11   the relative size and strength of the parties).

12       Defendant claims that an injunction would deprive it of "marketing its new '100% Sirloin

13   Burger' product (and competing against its competitors) in the manner it has chosen to be most

14   effective." (Opposition 21:18-20.) Defendant claims that this would cause extreme hardship

15   because "the two commercials are for a new product that [Defendant] is in the process of

16   branding and that, absent the current advertising campaign, [Defendant] will suffer a period

17   during which only one less focused advertisement for its sirloin hamburger will run."

18   (Opposition 21:20-25.) Further, Defendant states that it would be forced to incur significant

19   expense to create and distribute the necessary replacement commercials. (Graham Decl. ¶¶ 5-8.)

20       Plaintiffs state that they stand to suffer significantly more harm than Defendant if an

21   injunction does not issue. Plaintiffs state that they will "continue to be irreparably harmed by the

22   false and misleading claims of Defendant intended to divert customers away from CKE."

23   (Plaintiffs' Memorandum 9:18-20.) But to support their argument, Plaintiffs rely on the same

24   speculative statements discussed in Section 1.1.2. Also, Plaintiffs attempt to discredit

25   Defendant's arguments of harm by stating that Defendant has many other commercials that

26   feature its Sirloin burger, and thus it would not have to incur the expense of replacing the

27   challenged commercials. (Reply 16:8-12.) Even if this were true, Plaintiffs have not established

28   sufficient evidence to tip the hardships significantly in their favor.

1    Thus, Court does not find that Plaintiffs have demonstrated that the balance of hardships

2  tips decidedly in their favor, particularly because Plaintiffs only marginally raised serious

3  questions as to the likelihood of their success in Section 1.1.1.

4

5  **DISPOSITION**

6

7    At this time, the Court finds Plaintiffs' Motion is DENIED.

8

9  **IT IS SO ORDERED.**

10 DATED: July 2, 2007

11

12

13                        Andrew J. Guilford

14                      United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28